UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

SHANNON S. D.,

              Plaintiff,

v.

ANDREW SAUL, *Commissioner of Social Security*,

              Defendant.

No. 0:19-cv-00953-NEB-KMM

**REPORT AND RECOMMENDATION**

    Shannon S. D. ("Ms. D") brought this action challenging the denial of her applications for Social Security disability insurance benefits and supplemental security income by the Commissioner of the Social Security Administration ("SSA"). This matter is before the Court on the parties' cross-motions for summary judgment. [Pl.'s Mot., ECF No. 12; Def.'s Mot., ECF No. 17.] For the reasons set forth below, the Court recommends that Ms. D's motion be denied, the Commissioner's motion be granted, and this matter be dismissed.

**I.    Background**

    Ms. D suffers from several medical conditions for which she has received treatment over the years, including: Ehlers-Danlos Syndrome ("EDS");[1] systemic lupus erythematosus;[2] asthma; migraine headaches; mild osteoarthritis in both hands;

---

[1]     An April 7, 2015 consultation for Ms. D's EDS diagnosis includes a lengthy background discussion regarding this impairment: "Ehlers Danlose Syndromes are a group of genetic disorders of connective tissue stability. … Chronic musculoskeletal pain, depression, and anxiety are extremely common in EDS and can be challenging to manage. Mainstays of management include physical therapy focusing on muscle strengthening, regular joint friendly exercise, and meticulous self hygiene." R. 547; *see also Stedman's Medical Dictionary* 1735 (27th ed. 2000) (Ehlers-Danlos *syndrome*).

[2]     Systemic lupus erythematosus ("SLE") is "an inflammatory connective tissue disease with variable features, frequently including fever, weakness and fatigability, joint pains or

1

hypermobility arthralgia; and obesity. [Tr. of Admin. Record ("R.") at 21, ECF No. 10.] She has also been treated for complications with sleep, a vitamin B12 deficiency, and reproductive issues. [*See* R. 22 (ALJ's opinion regarding non-severe impairments).] Among other issues, Ms. D's symptoms include fatigue, muscle pain, brain fog, and dislocations due to hypermobility in her joints. She has difficulty walking long distances, needs help from her husband to grocery shop, uses assistive devices to navigate her own home, and does not engage in the crafting hobbies she enjoys.

For several years before she sought disability benefits, Ms. D worked as a personal care attendant. In 2011, however, complications from her impairments caused her to stop working and apply for benefits from the SSA. She originally applied in May of 2012, but her claim was denied by an Administrative Law Judge ("ALJ") in a written decision dated April 4, 2014. [R. at 196–216.] In March of 2015, again Ms. D applied for disability benefits, alleging that she had been disabled since April 5, 2014. [R. 345–57.] After the SSA denied Ms. D's application initially and on reconsideration, she requested a hearing before an ALJ. On December 20, 2017, ALJ Pamela Loesel held a brief hearing. However, the ALJ determined that the testimony of a medical expert was needed to interpret the evidence regarding Ms. D's conditions. [R. 62–76.] ALJ Loesel held a second hearing on May 6, 2018, and heard testimony from Ms. D and from a medical expert, Dr. Robert Sklaroff. [R. 77–151.] Dr. Sklaroff reviewed Ms. D's medical records before the hearing, asked several questions at the hearing of Ms. D and her counsel, and ultimately testified that Ms. D does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R., Part 404, Subpart P, Appendix 1 ("the Listings"). He also testified that Ms. D retained the functional capacity to perform medium work, with some additional restrictions. [R. 110–11]; 20 C.F.R. §§ 404.1567(c), 416.967(c) ("Medium work involves lifting no more than 50 pounds at a time with frequent lifting of carrying of objects up to 50 pounds.").

On June 19, 2018, ALJ Loesel denied Ms. D's claims in a written decision applying the required five-step sequential evaluation. [R. 19–30.] The ALJ determined

---

arthritis resembling rheumatoid arthritis, diffuse erythematous skin lesions on the face, neck, or upper extremities," with other features. *Stedman's Medical Dictionary* 1037 (27th ed. 2000).

2

that Ms. D was not engaged in substantial gainful activity and had several severe impairments, including: "Ehlers Danlos Syndrome, systemic lupus erythematosus, asthma, migraine headaches, mild osteoarthritis hands, hypermobility arthralgia, and obesity." [R. 21–22.] The ALJ next found that Ms. D does not have an impairment or combination of impairments that meets or medically equals any of the Listings. Specifically, ALJ Loesel considered the following Listings: impairment involving the major dysfunction of a joint (Section 1.02); labrynthine vestibular disorders (Section 2.07); and systemic lupus erythematosus (Section 14.02) and undifferentiated and mixed connective tissue disease (Section 14.06). [R. 22–23.]

The ALJ further concluded that Ms. D has the residual functional capacity ("RFC") to perform sedentary work.[3] However, the ALJ imposed the following additional restrictions on Ms. D's work-related abilities: limits on climbing, kneeling, crouching, and crawling; avoiding concentrated exposure to extreme cold and to fumes, odors, dusts, gases and poor ventilation; avoiding moderate exposure to hazards; and limits on the frequency of bilateral handling and fingering. [R. 23–28.] The ALJ next determined that although her RFC precluded Ms. D from performing her past relevant work as a personal care attendant or home health aide, she found that other jobs exist in significant numbers in the national economy that Ms. D can perform. [R. 28–30.] Specifically, the ALJ determined that Ms. D could perform the requirements of such jobs as a "Table Worker," "Final Assembler," and "Bonder." [R. 29–30.]

The ALJ considered several medical opinions in Ms. D's file that are relevant to this appeal. The ALJ gave "partial weight" to the opinions of the State Agency medical examiners who determined that Ms. D was not disabled. These reviewers did not examine Ms. D personally, but only reviewed the medical records available to them when Ms. D applied for benefits and later sought reconsideration of the SSA's initial denial of her

---

[3]   Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

20 C.F.R. § 404.1567(a), 416.967(a).

claim. ALJ Loesel found that a complete review of the record suggested that Ms. D had greater limitations than these physicians opined,[4] and discounted their opinions on that basis. [R. 27.] The ALJ also considered Dr. Sklaroff's testimony at the hearing, giving great weight to his opinion that Ms. D did not meet or medically equal any of the Listings, but little weight to his opinion that she retained the RFC to perform "medium work." [*Id.*]

ALJ Loesel also discounted two opinions from health care professionals who treated Ms. D. Nurse Practitioner Jennifer Hanson, Ms. D's primary care provider, provided an opinion on June 23, 2015, indicating that Ms. D's lupus and Ehlers-Danlos Syndrome conditions were permanent conditions and that Ms. D would not be able to perform any employment for the foreseeable future. [R. 628.] ALJ Loesel gave this opinion "limited weight" because it did not include any RFC assessment, Nurse Hanson is not an "acceptable medical source," and she offered an opinion on an issue that is reserved for the Commissioner. [R. 27.] The ALJ also considered a report prepared by Dr. Parastoo Fazeli, a rheumatologist who treated Ms. D's lupus. Ms. D had applied for student-loan forgiveness from the United States Department of Education, and the Department sought support for Ms. D's assertion that she was prevented from engaging in substantial gainful activity. In a Department of Education form, Dr. Fazeli checked a box indicating that Ms. D was not able to engage in substantial gainful activity due to her diagnoses of connective tissue disease, Ehlers-Danlos syndrome, and fibromyalgia. [R. 27–28; R. 670.] ALJ Loesel found that Dr. Fazeli's report gave an opinion on an issue reserved for the Commissioner and that it did not contain any RFC assessment. She assigned it little weight. [R. 28.]

Ms. D requested review of ALJ Loesel's decision from the SSA's Appeals Council, but it denied her request. [R. 1–5.] The Appeals Council noted that Ms. D submitted several categories of additional evidence along with her appeal, but the Council excluded this evidence. Relevant to this case, the Appeals Council rejected

---

[4] At the initial and reconsideration level, the record-reviewing physicians essentially suggested that Ms. D could perform light work with additional restrictions. [R. 159–61, 174–77, 186–89]; 20 C.F.R. §§ 404.1567(b), 416.967(b).

additional evidence Ms. D submitted from Dr. Fazeli and from BlueCross BlueShield Minnesota ("Blue Cross"). It stated:

> You submitted records from Parastoo Fazeli, M.D., dated September 7, 2018 to October 17, 2018 (4 pages); BlueCross BlueShield Minnesota, dated October 17, 2018 (1 page); and BlueCross BlueShield Minnesota , dated July 23, 2018 to October 3, 2018 (3 pages). The Administrative Law Judge decided your case through June 22, 2018. This additional evidence does not relate to the period at issue. Therefore, it does not affect the decision about whether you were disabled beginning on or before June 22, 2018.

[R. 2.]

The additional information referenced by the Appeals Council includes a record of a positive ANA blood test result—the diagnostic test for lupus—which was ordered by Dr. Fazeli on September 7, 2018, and an email from Dr. Fazeli to Ms. D on October 17, 2018, in which she explains that Ms. D "meet[s] SLICC criteria for Lupus based on a + ANA, + anti-DNA, arthritis, oral ulcers, and hair loss." [R. 7, 9.] The additional evidence Ms. D provided from Blue Cross indicates that she was initially denied insurance coverage for a motorized wheelchair, but that the insurer later approved coverage for the device. [R. 6, 13–15.] She provided additional records documenting the prescription for the powered wheelchair.[5] [R. 37–45, 50–61.]

## II. Legal Standard

Review of the Commissioner's denial of an application for disability benefits is limited and deferential, requiring the denial to be affirmed if it is supported by "substantial evidence" on the record as a whole. *Gann v. Berryhill*, 864 F.3d 947, 950 (8th Cir. 2017); *Cline v. Colvin*, 771 F.3d 1098, 1102 (8th Cir. 2014). Substantial evidence is less than a preponderance, but is such relevant evidence that a reasonable person would find it adequate to support the ALJ's determination. *Blackburn v. Colvin*, 761 F.3d 853, 858 (8th Cir. 2014). A reviewing court must consider not only the evidence that supports the conclusion, but also that which detracts from it. *Bergmann v. Apfel*, 207

---

[5] The ALJ also considered evidence concerning a powered mobility device, including a prescription written by Nurse Hanson. [R. 28 (citing R. 947–56, 969).]

5

F.3d 1065, 1068 (8th Cir. 2000). However, the Commissioner's decision will not be reversed simply because substantial evidence might also support a different conclusion. *Gann,* 864 F.3d at 950. So long as the Commissioner's decision does not fall outside of the "available zone of choice," it should be affirmed. *Hacker v. Barnhart*, 459 F.3d 934, 936 (8th Cir. 2006). In other words, where the Commissioner's decision is among the reasonable conclusions that can be drawn from the evidence in the record as a whole, it will not be disturbed. *See Nicola v. Astrue*, 480 F.3d 885, 886 (8th Cir. 2007); *Buckner v. Astrue*, 646 F.3d 549, 556 (8th Cir. 2011).

### III.  Discussion

In her motion for summary judgment, Ms. D raises two arguments. First, she argues that the Appeals Council erred by excluding the additional evidence from Dr. Fazeli, including the positive ANA blood test results, and the documentation regarding a prescription for a powered wheelchair. [Pl.'s Mem. at 14–17, ECF No. 13.] Second, Ms. D argues that the ALJ erred in evaluating the medical opinion evidence in the record so that the denial of benefits was not based on substantial evidence. [*Id.* at 17–20.]

#### A.  Handling of Additional Evidence

Ms. D asserts that the blood-test results, the clarifying email from Dr. Fezali regarding her lupus diagnosis, and the prescription for a motorized wheelchair undermine the ALJ's reliance on the medical expert's testimony that she does not meet or medically equal any of the Listings. She also suggests that the additional evidence indicates she has greater limitations in her daily activities than the ALJ acknowledged. [Pl.'s Mem. at 14–17.] The Commissioner argues that the Appeals Council's rejection of both categories of evidence is a decision that cannot be reviewed. Alternatively, if the Appeals Council's decision is subject to review, the Commissioner asserts that the additional evidence was properly rejected and would not have changed the outcome. [Def. Mem. at 7–12, ECF No. 18.] For the reasons that follow, the Court concludes that although the Appeals Council's decision is reviewable, Ms. D has failed to show reversible error.

6

### 1. Reviewability

First, the Court rejects the Commissioner's argument that it lacks jurisdiction to review the Appeals Council's decision to exclude the additional evidence submitted by Ms. D in support of her claim. The Social Security regulations require the Appeals Council to review a case if it "receives additional evidence that is new, material, and relates to the period on or before the date of the hearing decision, and there is a reasonable probability that the additional evidence would change the outcome of the decision." 20 C.F.R. § 404.970(a)(5); 20 C.F.R. § 416.1470(a)(5). In *Bergmann v. Apfel*, 207 F.3d 1065, 1069–71 (8th Cir. 2000), the Eighth Circuit reversed a denial of benefits and remanded the case to the Commissioner for reconsideration based on evidence submitted subsequent to the ALJ's decision. In doing so, the court interpreted the relevant regulations, explaining that evidence is "new" if it is not "merely cumulative of other evidence in the record." *Id.* 1069. It also explained that evidence is "material" if it is relevant to the claimant's functioning and involves more than "after-acquired conditions or post-decision deterioration of a pre-existing condition." *Id.* at 1069–70. Whether evidence meets these criteria is a question of law that is reviewed de novo. *Id.* at 1069. Consistent with *Bergmann*, this Court has jurisdiction to review whether the Appeals Council complied with 20 C.F.R. § 404.970 and 20 C.F.R. § 416.1470 when it declined to make the new evidence part of the record. *See also Keeton v. Dep't of Health & Human Servs.*, 21 F.3d 1064, 1066 (11th Cir. 1994) ("When the Appeals Council refuses to consider new evidence submitted to it and denies review, that decision is also subject to judicial review because it amounts to an error of law.").

### 2. The Outcome Remains the Same

Although the Court rejects the Commissioner's jurisdictional argument, it finds that the ALJ's denial of benefits should not be reversed because there is no reasonable probability that the evidence would change the outcome of the ALJ's decision.

#### a. Blood Test Evidence

Ms. D argues that the Appeals Council erred in rejecting the blood test evidence and Dr. Fazeli's email because they confirmed her lupus diagnosis, which is a chronic

condition she has experienced since she was 19 years old. [Pl.'s Mem. at 14–15.] The Appeals Council merely noted that the ALJ decided the case on June 22, 2018, and without additional explanation, rejected the evidence because it did not "relate to the period at issue." [R. 2.]

It is difficult to see how the Appeals Council could reasonably have concluded that the additional evidence from Dr. Fazeli did not relate to the period that predated the ALJ's opinion. Dr. Fazeli clearly believed that the positive ANA test confirmed her lupus diagnosis, which certainly predated the ALJ's decision. There was no indication that the positive ANA test simply indicated a worsening of the condition from the few months after the ALJ's decision or that it was a new condition. The Appeals Council's treatment of this evidence as not related to the period at issue appears to have stemmed solely from the fact that it was dated after June 22, 2018. As a matter of law, evidence is not unrelated to the relevant period in a Social Security disability claim merely because it is dated after that period is closed. *Stimpson v. Berryhill*, No. 17-CV-0824 (HB), 2018 WL 1440336, at *5 (D. Minn. Mar. 22, 2018) ("[T]he fact that an opinion was rendered after the adjudicated period does not *per se* disprove its relevancy, because such evidence may relate to a claimant's impairments during the adjudicated period.") (citing *Vandenboom v. Barnhart*, 421 F.3d 745, 750 (8th Cir. 2005)). For that reason, the Court finds that the Appeals Council erred in rejecting the blood test evidence and Dr. Fazeli's email on the sole basis that these materials did not relate to the period at issue.

However, the Court's conclusion that the Appeals Council erred in this respect does not mean that the denial of benefits must be reversed and the case should be sent back to the SSA for further consideration. As explained below, the Appeals Council's error is harmless because there is no reasonable probability that the blood test evidence or Dr. Fazeli's email would change the outcome of the ALJ's decision. The relevant regulations require Appeals Council review only where additional evidence "is new, material, and relates to the period on or before the date of the hearing decision, *and there is a reasonable probability that the additional evidence would change the outcome of the decision*." 20 C.F.R. § 404.970(a)(5); 20 C.F.R. § 416.1470(a)(5) (emphasis added). The additional blood test evidence does not create a reasonable probability that the outcome would change if it is considered alongside the rest of the evidence before the ALJ.

8

Dr. Fazeli's October 2018 notes regarding the September 2018 blood test results state "we could call the disease lupus" with the positive ANA test, and she recommended increasing Ms. D's dosage of Plaquenil and adding Benlysta to help with Ms. D's symptoms of pain and fatigue. [R. 7, 9.] This evidence provides further confirmation of the basis for Ms. D's lupus diagnosis, but it provides little additional value for Ms. D's disability claim. The ALJ had already accepted that both lupus and a connective tissue disorder were among Ms. D's medically determinable severe impairments. The additional evidence confirming her diagnosis does not further illuminate the severity of Ms. D's symptoms or the functional limitations she experiences as a result of systemic lupus or connective tissue disease. As a result, the Court finds that the ALJ Loesel's decision would not have changed had this additional evidence been before her.

Ms. D next suggests that the additional evidence could reasonably change the outcome of her case and should be considered in connection with the ALJ's Listings analysis because the absence of a confirming diagnosis "was used to justify the lack of each listing." [Pl.'s Mem. at 15.] She contends that the additional evidence objectively confirming the lupus diagnosis "was precisely what Dr. Sklaroff, hence the ALJ, concluded was needed to support finding any listed disability for [Ms. D] due to her lupus." [Pl.'s Mem. at 14–15.] The Court disagrees.

The ALJ's finding at step three of the sequential analysis was not based on the absence of a confirming diagnosis for lupus or connective tissue disease. Instead, ALJ Loesel concluded that the Listings for systemic lupus (14.02) and mixed connective tissue disease (14.06) were not met or medically equaled because "[t]he evidence does not show involvement of multiple body systems of a moderate level with severe fever, malaise, or involuntary weight loss. There are no repeated manifestations of the disease process." [R. 23.] Contrary to Ms. D's argument, the ALJ's analysis does not hinge upon the absence of a confirming diagnosis, and the ALJ did not express doubt that Ms. D suffers from lupus. Rather, the ALJ determined that the evidence did not establish the criteria for finding that the severity of these Listings were met or medically equaled. 20 C.F.R., Part 404, Subpart B, Appendix I, §§ 14.02(A), (B) & 14.06(A), (B).

For these reasons, the Court concludes that even though the Appeals Council erred as a matter of law in rejecting the blood test evidence, that error was harmless because the evidence did not create a reasonable probability that the outcome would have been different had the evidence been made part of the record.

### b. Motorized Wheelchair Evidence

Ms. D argues that the Appeals Council also erred in rejecting the additional evidence she submitted regarding her prescription for a powered wheelchair. She acknowledges that she received the prescription prior to the hearing and argues that it should have provided a basis for Appeals Council review because it "relates to her mobility issues, particularly her endurance, and directly contradicts the ALJ's determinations that Ms. [D] has ample endurance for the RFC assessed in her decision." She also suggests that the evidence bears directly on whether Ms. D meets or equals any Listing. [Pl.'s Mem. at 16–17.] The Appeals Council concluded that some of this evidence did not show a reasonable probability that it would change the outcome of the decision. [R. 2 (citing R. 37–45, 50–51, and 52–61).] It also concluded that the BCBS documentation regarding the wheelchair did not relate to the period at issue. [R. 2 (citing R. 13–15).]

The Appeals Council erred in concluding that the Blue Cross documentation did not relate to the period at issue. As noted by Ms. D in her brief, the ALJ in her opinion, and the Commissioner in her memorandum, Ms. D was prescribed a powered mobility device prior to the ALJ's decision, and the ALJ considered that very evidence in ruling on the disability claim. However, that error does not require reversal under these circumstances because there is no reasonable probability that the evidence would have changed the outcome of the case had it been before the ALJ.

ALJ Loesel's opinion notes that Ms. D "was prescribed multiple medical devices including recommendation for a motorized wheelchair and a van to transport it by her nurse practitioner." [R. 28.] Indeed, in late February 2018, an occupational therapist noted that Ms. D "would benefit from a power mobility device such as a scooter to increase patient independent and successful participation in activities requiring ambulation endurance and strength such as walking the dog, grocery shopping, social

10

participation and [independent activities of daily living] outside the home." [R. 888–91.] And Nurse Hanson indicated in a May 4, 2018 letter that Ms. D "is in need of a motorized wheelchair and van to transport it" based on her chronic medical issues that caused limited mobility. [R. 969.] However, in discussing the medical evidence, the ALJ pointed to other evidence in the record suggesting that Ms. D's functioning was consistent with the ultimate RFC finding. The ALJ noted that Ms. D reported engaging in a home exercise program; that she was able to volunteer, teaching and tutoring English as a second language; that she engaged in several activities that required work with her hands and fingers; and that she reported engaging in yard work and gardening. [R. 28.] ALJ Loesel also noted that much of Ms. D's medical treatment was conservative and routine; that her providers recommended physical therapy and occupational therapy; and that she was advised to stay as active as possible. [R. 28.] The Court further notes that several of Ms. D's medical records indicate that "no assistive device [was] required for ambulation." [R. 575–78, 852–57, 664–67, 751–59, 769–77.]

Based on this Court's review of the record as a whole, substantial evidence supports the ALJ's discussion of the record. [*See, e.g.*, R. 546–53, 862–69, 879–81, 954–56.] Accordingly, the Court finds that there is no reasonable probability that the additional evidence concerning a motorized wheelchair would have changed the outcome of the decision if the ALJ had been provided with it prior to issuing her ruling.

### c. Listings Discussion

Ms. D asserts that the "medical records reflect that [she] has multiple overlapping autoimmune conditions: three when the lupus is recognized, which satisfies listing 14.06. The ALJ herself notes the fevers and malaise reported in the medical records…. The power wheelchair recommendation was made by her treating nurse practitioner (and ultimately approved) precisely because of [Ms. D's] lack of stamina and mobility problems." [Pl.'s Mem. at 16.] Ms. D does not clearly make a standalone argument in her brief that the ALJ erred at step three of the sequential analysis; rather, she connects it to the Appeals Council's erroneous rejection of the additional evidence. As explained above, the Appeals Council's errors do not require reversal. To the extent that Ms. D

11

raises an explicit Listings challenge, the Court concludes that the ALJ's decision at step three of the sequential analysis was adequately supported by the record.

Listings 14.02 and 14.06, both of which address disorders of the immune system, have similar requirements. In Paragraph A, they require a claimant to show "involvement of two or more organs/body systems" with one of the organs/body systems involved "to at least a moderate level of severity"; and "[a]t least two of the constitutional symptoms or signs (severe fatigue, fever, malaise, or involuntary weight loss)." Listings §§ 14.02(A)(1) & (2), 14.06(A)(1) & (2).[6] The Paragraph B criteria for Listing 14.02 requires "[r]epeated manifestations of [lupus] with at least two of the constitutional symptoms or signs (severe fatigue, fever, malaise, or involuntary weight loss)" along with marked limitations in either activities of daily living, maintaining social functioning, or completing tasks in a timely manner due to deficiencies in concentration, persistence, or pace. Listings § 14.02(B). The Paragraph B criteria for Listing 14.06 are similar, substituting "undifferentiated or mixed connective tissue disease" for lupus itself. Listings § 14.06(B).

It is important to note that a confirmed diagnosis of lupus or connective tissue disorder alone is not enough to satisfy the Listings. Instead, the SSA regulations provide "[w]hen we use one of the listings cited in 14.00I1 [which includes 14.02 and 14.06], we will consider all relevant information in your case record to determine the full impact of your immune system disorder on your ability to function on a sustained basis." Listings § 14.00(I)(2). An ALJ considers a claimant's "symptoms, the frequency and duration of manifestations of [her] immune system disorder, periods of exacerbation and remission, and the functional impact of [her] treatment, including the side effects of [her] medication." *Id.*

Although Ms. D focuses in part on her fevers, in her argument she cites only to the ALJ's recitation of Ms. D's own testimony. [R. 24 ("She said she has frequent fevers and is bedridden and cannot get out of bed. She has a fever three times a week.").] Ms. D testified that she experiences fevers on a regular basis, but the medical records in the

---

[6] The Court cites to the version of the Listings for immune system disorders that became effective on March 14, 2018 because that was the version in effect at the time of the ALJ's decision. This is the most recent version.

administrative file do not support this assertion. Ms. D does not cite to evidence in the record that substantiates the claim that she experiences frequent fevers. The record includes an October 7, 2015 treatment note for a complaint of fever and a body temperature measurement of 99.9º F. Ms. D's counsel identified this record at the hearing as evidence of fever in the record, indicating that it was not the only example. [R. 668, 778, 794; R. 112–13 (hearing testimony).] Elsewhere in her brief, Ms. D cites a February 26, 2015 treatment note indicating that she had a fever that day, but the chart reflecting her vital signs showed readings of 98.1º and 98.2º F. [R. 538–39.] She also cites a January 23, 2013 treatment note from an online patient encounter in which the provider notes that Ms. D reported having a fever 1 to 2 days in the previous week, with the highest reading of 99.5º F. Notably, this record is from before Ms. D's alleged onset date of April 5, 2014. [R. 671.] Numerous other medical records reflect normal body temperature readings. [R. 510, 528, 619, 658, 732, 760, 826, 904, 927.] This evidence is insufficient to convince the Court that the ALJ erred in evaluating the evidence concerning the severity or limiting effects of Ms. D's fevers.

Ms. D correctly notes that Dr. Sklaroff questioned the diagnosis of lupus during his testimony at the second hearing. [*See* R. 98–99, 100–10, 111–12.] And it cannot be disputed that Ms. D's treating providers had diagnosed her with lupus for several years prior to Dr. Sklaroff's review of the medical records. But Dr. Sklaroff did not base his conclusion that Ms. D did not meet or medically equal any of the Listings solely on the absence of a confirming blood test. He also testified that in his opinion the criteria for Listing 14.02 were not satisfied and that he did not "see documentation of fevers at any time." [R. 106.]

> With respect to fatigue and malaise, the SSA regulations provide:
>
> Severe fatigue means a frequent sense of exhaustion that results in significantly reduced physical activity or mental function. Malaise means frequent feelings of illness, bodily discomfort, or lack of well-being that result in significantly reduced physical activity or mental function.

Listings § 14.00(C)(2). Ms. D points to the ALJ's acknowledgment that physical therapy records noted she continued to experience fatigue despite improvement in her strength with her adherence to a home exercise program. [Pl.'s Mem. at 16 (citing R. 25

13

(discussing April 22, 2015 letter from a physical therapist at R. 474)).] However, the letter from her physical therapist specifically notes that no formal assessment of Ms. D's functional abilities was performed and does not characterize the fatigue Ms. D reported as "severe." Nor does Ms. D point to any specific evidence concerning malaise that results in significantly reduced physical activity or mental function.

The Court also finds no merit to Ms. D's argument that the Commissioner failed to fully and fairly develop the record. [Pl.'s Mem. at 15–16.] This is not a case, for example, where an ALJ failed to consider Listing 14.02 for a claimant who had been diagnosed with lupus and discounted her rheumatologist's opinion merely because medical records were missing. *See Hanovich v. Astrue*, 579 F. Supp. 2d 1172, 1207–09 (D. Minn. 2008) (reversing denial of benefits and remanding case to the Commissioner where the ALJ did not discuss Listing 14.02 at all and failed to adequately develop the record by obtaining the relevant documentation from the claimant's treating physician). Consistent with the RFC discussion below, the Court finds that the ALJ reasonably concluded that "all relevant information in [Ms. D's] case record" did not establish her inability "to function on a sustained basis" as a result of her immune disorders. *See* Listings § 14.00(I)(2).

### B. Opinion Evidence

Next, Ms. D argues that the ALJ erred in evaluating the opinion evidence. Ms. D asserts that Dr. Fazeli's report in response to the inquiry from the United States Department of Education should have been given controlling weight. She also contends that the ALJ should not have discounted Nurse Hanson's June 23, 2015 opinion that she would not be able to engage in work activities for the foreseeable future. [Pl.'s Mem. at 17–20.] The Court concludes there is no basis for reversal on the ALJ's handling of the opinion evidence.

### 1. Legal Standards

For claims like Ms. D's that were filed prior to March 27, 2017,[7] the SSA's regulations direct the Commissioner on how to weigh medical opinion evidence based

---

[7]   For claims filed on or after March 27, 2017, weight is assigned to medical opinions in accordance with 20 C.F.R. § 404.1520c and 20 C.F.R. § 416.920c. Under the new regulations,

14

upon the source of the opinion. 20 C.F.R. § 404.1527; 20 C.F.R. § 416.927. If a treating physician provides an opinion that is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is consistent with other substantial evidence, then an ALJ will give that opinion "controlling weight." *Myers v. Colvin*, 721 F.3d 521, 525 (8th Cir. 2013). However, an ALJ may discount a treating physician's opinion where other opinions are better supported or where the treating physician's opinions are inconsistent. *Wildman v. Astrue*, 596 F.3d 959, 964 (8th Cir. 2010). If a treating physician's own treatment notes do not support the opinion or it is inconsistent with other evidence in the record, the ALJ may properly discount or reject the conclusions of that opinion. *Myers*, 721 F.3d at 525. A treating physician's opinion that is conclusory may also mean that it is entitled to little weight. *Thomas v. Berryhill*, 881 F.3d 672, 675 (8th Cir. 2018). The ALJ is required to give "good reasons" for the weight assigned to a treating physician's opinion. *Prosch v. Apfel*, 201 F.3d 1010, 1013 (8th Cir. 2000). The ALJ should consider the length of the treating sources relationship and how frequently the claimant saw the provider in evaluating an opinion. *Lawson v. Colvin*, 807 F.3d 962, 965 (8th Cir. 2015). The Court must determine whether the ALJ's finding about the appropriate weight to be assigned to the opinion is supported by substantial evidence. *Brown v. Astrue*, 611 F.3d 941, 951 (8th Cir. 2010).

Opinions offered by non-examining sources are generally entitled to less weight than the opinions given by examining sources. *Willcockson v. Astrue*, 540 F.3d 878, 880 (8th Cir. 2008). When determining what weight is owed to a non-examining source's opinion, the ALJ evaluates whether the source considered all of the relevant evidence and whether he or she provided support for the opinion. 20 C.F.R. § 404.1527(c)(1), (c)(3); 20 C.F.R. § 416.927(c)(1), (c)(3).

### 2. Non-Examining Physicians

First, the Court finds that the ALJ did not err in evaluating the opinions of the non-treating, non-examining physicians. In part, the Court notes that the ALJ did not simply

---

the SSA does not defer to any medical opinions, including from treating medical sources; instead it considers all medical opinions according to enumerated factors and deems the most important factor to be supportability and consistency. *Id.* Because Ms. D filed her claim in 2015, the previous regulations apply.

accept the state agency reviewers' opinions offered on August 19, 2015, and October 21, 2015. [R. 152–63, 168–79, 180–91.] Rather, the ALJ gave these opinions only partial weight because the complete record showed more significant limitations existed than the reviewing physicians recommended. [R. 27.] The fact that these reviewers did not have all of the relevant evidence for analyzing Ms. D's claim justified the ALJ's decision to discount their opinions that she retained greater functional abilities than was ultimately reflected in ALJ Loesel's RFC finding. The Court finds no error in the ALJ's handling of these opinions and concludes that the assignment of only partial weight was supported by substantial evidence.

For the reasons discussed above, the Court also finds no error with the ALJ's handling of Dr. Sklaroff's opinions. There is substantial evidence in the record to support the ALJ's assignment of great weight to Dr. Sklaroff's opinion that Ms. D did not meet or medically equal any of the Listings. There is also substantial evidence to support the ALJ's decision to give little weight to Dr. Sklaroff's opinion that Ms. D could perform medium work. [R. 27.]

### 3. Dr. Fazeli's Opinion

The Court also finds that the ALJ provided a valid basis for discounting Dr. Fazeli's response to the Department of Education inquiry. As noted, the Department of Education indicated that a doctor's response was needed based on Ms. D's request for discharge of a student loan obligation. In response, Dr. Fazeli checked a box on the provided form indicating that Ms. D's diagnosis prevents her from engaging in substantial gainful activity and another indicating that the severity of her diagnosis is expected to remain the same or worsen with or without treatment or intervention. In response to a request that she clarify abbreviations regarding the relevant diagnoses, Dr. Fazeli listed: undifferentiated connective tissue disease; Ehlers-Danlos syndrome; and fibromyalgia syndrome. [R. 670.]

ALJ Loesel gave this report little weight because it was not a functional capacity assessment of Ms. D's ability to work, did not contain a residual functional capacity assessment, and "[t]he opinion is also reserved for the commissioner." [R. 27–28.] Substantial evidence supports the ALJ's determination that the form included no

16

functional capacity assessment concerning work-related limitations. Instead, it was a conclusory check-the-box form asking questions different from those before the ALJ, and it provided little support for the opinions given. It was further appropriate for the ALJ to discount Dr. Fazeli's opinion that Ms. D could no longer engage in substantial gainful activity because that is an ultimate issue reserved to the Commissioner. *See Schwandt v. Berryhill*, 926 F.3d 1004, 1011 (8th Cir. 2019) (concluding that the ALJ properly declined to weigh an opinion from a treating provider that the claimant could perform only sedentary work because that question "was an ultimate determination reserved to the Commissioner"); 20 C.F.R. §§ 404.1527(d)(1), 416.927(d)(1) ("A statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled."). Ms. D has failed to show reversible error in the ALJ's handling of this opinion.

### 4. Nurse Hanson's Opinion

Finally, the Court concludes that the ALJ provided good reasons for discounting Nurse Hanson's June 23, 2015 opinion. Nurse Hanson noted Ms. D's diagnoses of lupus and Ehlers-Danlos Syndrome and that these were permanent conditions. She also noted that Ms. D had difficulty walking and balancing. Nurse Hanson checked boxes indicating that she prescribed a treatment plan, which Ms. D was following. Finally, in response to the question "[w]hen will the patient be able to perform employment," Nurse Hanson indicated that Ms. D "will not be able to perform any employment in the foreseeable future." [R. 628.] The ALJ gave Nurse Hanson's opinion "limited weight" for three reasons: it did not contain a residual functional capacity assessment; Nurse Hanson did not qualify as an "acceptable medical source"; and Nurse Hanson offered an opinion on an ultimate determination reserved to the Commissioner. [R. 27.]

Substantial evidence supports the ALJ's decision to discount the weight to which Nurse Hanson's opinion was entitled. As noted above, an ALJ may properly reject a medical provider's opinion that a person is unable to work because that is an ultimate determination reserved to the Commissioner in a disability case like this one. It was, therefore, proper for ALJ Loesel to discount Nurse Hanson's opinion that Ms. D would not be able to perform any employment for the foreseeable future. *Schwandt*, 926 F.3d at

17

1011; 20 C.F.R. §§ 404.1527(d)(1), 416.927(d)(1). The ALJ also accurately noted that the opinion included no functional capacity assessment.

Ms. D suggests that the ALJ improperly rejected Nurse Hanson's opinion based on the conclusion that she is not an acceptable medical source within the meaning of the applicable regulations. [Pl.'s Mem. at 19–20.] The Court disagrees for two reasons. First, Ms. D's argument misconstrues ALJ Loesel's treatment of Nurse Hanson's opinion. The ALJ's written decision does not entirely reject Nurse Hanson's opinion based on her status as a nurse practitioner; rather, the ALJ found the opinion was entitled to "limited weight," in part based on Nurse Hanson's occupation. Accordingly, the Court disagrees with Ms. D's characterization of the ALJ's decision as improperly rejecting the opinion based on Nurse Hanson's professional qualifications.

Second, the applicable regulations distinguish between opinion evidence from "acceptable medical sources" and other health care providers who are not "acceptable medical sources." 20 C.F.R. §§ 404.1527(f), 416.927(f). Nurse practitioners are not considered "acceptable medical sources." 20 C.F.R. §§ 404.1502(a), 416.902(a). "In determining what weight to give 'other medical evidence,' the ALJ has more discretion and is permitted to consider any inconsistencies found within the record." *Raney v. Barnhart,* 396 F.3d 1007, 1010 (8th Cir.2005). Although the ALJ's specific discussion about the reasons for discounting Nurse Hanson's opinion does not provide extensive detail, reading the ALJ's written decision as a whole, it is clear that the ALJ found the opinion inconsistent with other evidence in the record as discussed in the RFC analysis. [*See* R. 25–26.] Given the discretion ALJ Loesel possessed to consider Nurse Hanson's opinion and the existence of inconsistencies in the record, the Court concludes that the ALJ did not err in giving the opinion limited weight.

### C. Residual Functional Capacity

Finally, to the extent Ms. D asserts that the ALJ's RFC determination was not adequately supported, the Court disagrees. The ALJ relied on medical records that supported the denial of benefits and that she found consistent with an RFC at the sedentary level, subject to additional restrictions. The evidence relied on by the ALJ includes physical therapy records from January through August of 2015 indicating that

physical therapy exercises helped Ms. D with increased strength, and she reported improvement in her ankles through conservative treatment with braces. [R. 474–94, 690–702.] At another appointment in 2015, Ms. D was observed to have a normal gait and did not use an assistive device for ambulation. [R. 575–78.] In April 2015, a genetics counselor advised Ms. D to stay as active as possible, and a lip biopsy did not confirm a suspicion that she had Sjorgen's syndrome. [R. 546–53, 558–70.] In a July 2015 orthopedic evaluation for bilateral knee pain, despite her hypermobility, she was observed to be fully weight bearing without ambulatory aids or a limp. [R. 638–40.] At a January 25, 2017 medical appointment, she reported engaging in crafts, such as crocheting and beadwork. [R. 710–11.] The ALJ correctly noted that Ms. D received quite limited treatment for all of 2016 [R. 760–77, 823–37], none of which suggested greater restrictions than those imposed in the ALJ's RFC finding were required. Ms. D reported that her health was good during an annual health exam in May 2017, and the registered nurse who saw her encouraged her to get daily exercise. [R. 745–50.] Records in 2018 indicated that she was involved in a home exercise program as part of her physical therapy program, she reported volunteering as a teacher and a tutor for English as a second language, and she engaged in yard work and gardening. [R. 862–69, 879–81, 954–56.]

Based on this evidence and other records confirming that Ms. D has clear limitations in her functional abilities, the ALJ determined that Ms. D retained the ability to engage in a significantly restricted list of work-related activities. The evidence discussed above, as well as the evidence on the record as a whole, provided substantial support for the ALJ's conclusion that Ms. D retained the ability to engage in sedentary work with additional restrictions. As a result, the Court concludes that the ALJ's RFC determination falls within the reasonable zone of choice made possible by this record, and the Court finds it is appropriate to affirm the Commissioner's denial of benefits on that basis.

### IV.   Recommendation

As discussed above, **IT IS HEREBY RECOMMENDED THAT:**

1. The Plaintiff's motion for summary judgment **[ECF No. 12]** be **DENIED**;

2. The Defendant's motion for summary judgment **[ECF No. 17]** be **GRANTED**; and

3. This matter be **DISMISSED WITH PREJUDICE**.

Date: February 10, 2020

                                        *s/Katherine Menendez*
                                        Katherine Menendez
                                        United States Magistrate Judge

## NOTICE

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served a copy of the objections. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set for in LR 72.2(c).

**Under Advisement Date:** This Report and Recommendation will be considered under advisement 14 days from the date of its filing. If timely objections are filed, this Report and Recommendation will be considered under advisement from the earlier of: (1) 14 days after the objections are filed; or (2) from the date a timely response is filed.